# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:07CR53

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Vs. | ) MEMORANDUM AND |
| | ) RECOMMENDATION |
| DAVID LAMONT HENSON. | ) |
| _____ | ) |

**THIS MATTER** is before the court upon defendant's Motion to Suppress Evidence (#11). On August 1, 2007, the court conducted an evidentiary hearing and heard oral arguments. On August 3, 2007, the government filed its response[1] to defendant's motion. On August 8, 2007, the defendant filed its reply[2] to the government's response. Having considered the evidence and the arguments, the undersigned respectfully enters the following findings, conclusions, and recommendation that defendant's Motion to Suppress Evidence be denied.

---

[1] The government's brief was mis-captioned as a "Reply" to defendant's Motion to Suppress.

[2] The defendant's brief in reply was mislabeled in the caption as a "rebuttal" and in the court's docket as a response. All counsel are respectfully advised that, in federal court, briefs are captioned as follows: brief in support; brief in response; and brief in reply. These conventions assist this court as well as courts that may review these matters by providing an orderly and logical lexicon.

# FINDINGS AND CONCLUSIONS

## I.    The Indictment

Defendant is charged in a five count Superseding Bill of Indictment. Counts One, Two, and Three allege firearms and controlled substances violations that were purportedly discovered by the Asheville Police Department when it conducted a motor vehicle checkpoint on September 12, 2006. Count Four and Five also allege firearm violations, however, such charges stem from a search of defendant's home pursuant to a warrant on February 7, 2007, in Yancey County. Defendant has moved to suppress all evidence seized during the September 12, 2006, checkpoint, and has also moved to suppress all evidence seized during the February 7, 2007, search, arguing that the probable cause for such search was tainted by evidence improperly seized during the checkpoint.

## II.    The Checkpoint

Inasmuch as defendant's argument is that all evidence in this matter is tainted by what he contends was an improperly conceived and executed checkpoint, the undersigned has focused review on the checkpoint conducted September 12, 2006, in the City of Asheville. Based on the evidence presented

at the August 1, 2007, hearing, the court finds the following:

(1)     On September 12, 2006, members of the Asheville Police Department, pursuant to written and verbal department approval, conducted a vehicle checkpoint at the five-way intersection of Depot Street, Lyman Avenue, Roberts Street, and Clingman Avenue.

(2)     In it undisputed that this intersection is a busy intersection. Based on the court's own knowledge, the intersection is located in a recently revitalized portion of the city of Asheville, where a number of industrial buildings have been converted to retail shops, studios, and residential buildings. Such intersection is in close proximately to a guarded and busy railroad crossing immediately adjacent to a Norfolk Southern rail yard and roundhouse.

(3)     One of the officers participating in the checkpoint, a Traffic Safety Officer, Don Eberhardt, an eight year veteran of the Asheville Police Department, testified that he had written over 1,000 traffic citations during his tenure in this  community.

(4)     The checkpoint was conducted pursuant to a Special Operations Plan ("SOP") dated March 29, 2006.  Government's Exhibit 1.  The SOP

provided in relevant part:

> Riverside Drive, Depot Street and the surrounding area has been the site of numerous traffic violations and accidents. Within the last twelve months there have been at least 17 documented traffic related collisions on Riverside Drive. Officers have made over 110 traffic stops resulting in at least 75 enforcement actions.

(5)     Testimony was received that in addition to the aforementioned attributes of the area, there is also located in the vicinity of this intersection a popular nightclub called 'The Grey Eagle." Visitors to such club can park on the side of the roads in this area.

(6)     In the late evening hours of September 12, 2006, as calls for service diminished, APD officers decided to conduct a license checkpoint at the intersection.

(7)     Pursuant to department directives, they first sought supervisory approval.

(8)     During the checkpoint as many as five uniformed officers wore bright reflective vests and positioned marked police cruisers about the intersection. Thereafter these officers stood outside their marked police cruisers, while at least one cruiser's blue lights operated to notify approaching motorists of police presence.

(9)     As vehicles filtered through the intersection, officers spoke to each driver while the automobiles were in the lane of travel at each respective stop sign.

(10)    In this case, the defendant was not the driver of an automobile subject to the checkpoint, but was a passenger. Monica Davis, driver of the vehicle in which defendant was traveling, was issued a citation for not being in possession of a valid driver's license. Specifically, Ms. Davis was operating a van which approached the checkpoint intersection from Lyman Street. Government's Exhibit 3. Officer Eberhardt walked toward the driver's door. Upon reaching the driver's side door Eberhardt found Ms. Davis to be the driver. Defendant was in the front passenger seat of the van. In plain view, Eberhardt observed an open container of beer between the driver and passenger seats, a violation of North Carolina law.

(11)    Officer Eberhardt testified that when he attempted to interact with the driver, defendant interjected himself into the inquiry, answering questions for the driver.

(12)    Officer Eberhardt testified that he asked Ms. Davis to step out of the vehicle and to the rear of the van for further questioning. After requesting

that the that the driver step to the rear of the vehicle, Eberhardt instructed defendant to keep his hands on the dashboard. While speaking to Ms. Davis, Officer Eberhardt observed defendant through a window in the rear of the van. Officer Eberhardt saw defendant take his hands off the dash board and place a then unknown object beneath the seat.

(13) Concerned for his safety and suspicious that criminal activity was afoot, Officer Eberhardt left his position behind the van with Ms. Davis and approached the passenger door and asked defendant to step from the vehicle at which time Officer Eberhardt conducted a pat-down of Henson.

(14) During the pat down, Officer Eberhardt discovered a loaded .22 caliber pistol and 167 methadone pills.

(15) A subsequent search of the van's interior revealed that under the seat where Officer Eberhardt had observed defendant place an unknown object, Officer Eberhardt discovered another pistol, a .45/.410 caliber pistol, which was loaded with .410 caliber shotgun shells.

(16) Defendant was arrested, and defendant was later charged by the Grand Jury in a true Bill of Indictment with Counts One, Two, and Three, all of which directly stem from evidence seized at the September 12, 2007,

traffic stop.  For the limited purpose of the pending motion, the court has

taken as true plaintiff's allegation that the search warrant issued for

defendant's residence was based at least in part on evidence seized during

the checkpoint.[3]

## III.    Discussion

### A.    Introduction

Defendant contends that the September 12, 2007, was an unconstitutional

checkpoint, primarily arguing that while designated as a traffic safety or license

checkpoint, it was instead a thinly veiled checkpoint for general crime.  The

undersigned respectfully disagrees, finding the checkpoint to be valid under

current case law and the fourth amendment to the United States Constitution.

### B.    Framework for Determining Whether a Police Checkpoint is Constitutionally Valid

In considering the reasonableness of a checkpoint, courts typically

consider factors such as:

(1)    the neutral criterion implicit in a systematic procedure; <u>Hall v.</u>

---

[3]    No party to this action has tendered such warrant or the underlying affidavit to this court for consideration.  Respective counsel are advised that the court can only consider evidence which is presented to it in this case (except for judicial notice), and that the court does not gather evidence from other courts  for consideration.

Commonwealth, 12 Va.App. 972 (1991)

(2)     warning signs or flares; State v. Riley, 377 N.W.2d 242 (Iowa Ct.App.1985)

(3)     the safety of the location; Commonwealth v. McGeoghegan, 389 Mass.137 (1983)

(4)     the productivity of the roadblock; State v. Koppel, 127 N.H.286, 499 A.2d 977 (1985)

(5)     standardized procedures for the operation of the roadblock; State v. Larson, 485 N.W.2d 571 (Minn.Ct.App.1992) and

(6)     whether the roadblock was a pretext to uncover evidence of more serious criminal activity.  United States v. Morales-Zamora, 974 F.2d 149 (10th Cir.1992).

While none of these factors constitute binding authority, the court finds them to be instructive in analyzing the lawfulness of a checkpoint.  Further, such criteria appear to be wholly consistent with the reasoning of the United States Supreme Court in  Michigan Department of State Police v. Sitz, 496 U.S. 444 (1990). Faced with a similar issue in Sitz, the Court determined that a reviewing court must balance: (1) the importance of the public concerns served by the checkpoint; (2) the effectiveness of the checkpoint in advancing the public interest; and (3) the extent of the intrusion of the checkpoint on law-abiding motorists.  In an abundance of caution, the court will review this checkpoint based on the factors developed by other courts and then  analyze the checkpoint based on the criteria of Sitz.  Finally, the undersigned will review the checkpoint

in light of <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32 (2000).

### C.     Applying the Six Factor Test

The first factor requires determination of whether there was neutral criterion through the police employing a systematic procedure. <u>Hall v. Commonwealth</u>, <u>supra</u>.  The requirement that the police have in place a system for checking vehicles, such as every vehicle or every fifth vehicle, insures that officers do not impermissibly profile drivers or vehicles, or stop only vehicles that "look" suspicious. The undisputed testimony revealed that the officers did a license check on each vehicle that stopped at each of the five stop signs at the intersection.   Pursuant to the SOP, every officer was required to observe whether they detected the odor of alcohol on or about the person of each driver stopped.  The first factor is satisfied.

The second factor requires the court to determine whether the officers employed warning signs or flares. <u>State v. Riley</u>, <u>supra</u>.  In this case, the officers parked marked cars and turned on flashing blue emergency lights and donned reflective vests, clear indicia to reasonable drivers that they would be required to stop when they reached the intersection.  The second factor is satisfied.

The third factor concerns the safety of the location.  <u>Commonwealth v.</u>

McGeoghegan, supra. In this case, the checkpoint was conducted at a five way intersection that required during normal operation that all vehicles stop. In addition, the nearby railroad crossing was guarded by both lights and control arms. Further, the undisputed testimony is that the checkpoint was set up at a time of night when routine calls to the police department diminish. The court finds that this was an inherently safe location due to the time of day and the location at a well established point where motorists were otherwise required to stop. The third factor is satisfied.

The fourth factor requires consideration of the productivity of the roadblock. State v. Koppel, supra. The only evidence of productivity concerned the apprehension of Ms. Davis for driving without a valid driver's license. Further, evidence presented indicated that there was an open container of an alcoholic beverage in the front of the van, also a violation of North Carolina traffic law. Clearly, such an arrest was well within the intended scope of the traffic checkpoint, and points to the checkpoint being productive. As to how many traffic related violations were uncovered on that night, the court is unaware. Thus, the fourth factor is minimally satisfied.

The fifth factor requires consideration of whether there were standardized

procedures for the operation of the roadblock. State v. Larson, supra. The evidence presented indicates that the checkpoint was operated in accordance with the Asheville Police Department's SOP, and that the officers who conducted the checkpoint had not only sought and received supervisory approval, but called in supervisors to insure that they were complying with the SOP and relevant law. The fifth factor is met.

The sixth factor requires consideration of whether the traffic roadblock was a mere pretext to uncover evidence of more serious criminal activity. United States v. Morales-Zamora, 974 F.2d 149 (10th Cir.1992). Clearly, a checkpoint designed or operated for the purpose of detecting evidence of general crime is impermissible; however, is completely permissible and lawful for officers to uncover evidence of general crime in the course of conducting a traffic checkpoint. In this case, the undisputed evidence indicates that Officer Eberhardt approached the vehicle in which defendant was a passenger to conduct a license and traffic safety checkpoint, and in fact discovered at least two such violations. It was only when defendant interfered with Officer Eberhardt's discussion with the driver that further steps were taken to remove the driver from the vehicle for questioning. Further, it was defendant's own

furtive movement in the vehicle that caused his removal from the vehicle for officer safety. There is absolutely no evidence of record that the September 12, 2006, checkpoint was anything other than valid license and vehicle safety checkpoint. That more serious charges resulted does not constitute evidence to the contrary. Defendant was in a vehicle operated by a person without a valid driver's license; he allegedly interfered with the officer's routine questioning of the driver; and he was removed from the vehicle when his further furtive actions committed by the defendant in violations of the specific instructions of the office gave the officer a genuine reason to be concerned for his personal safety. The sixth factor is satisfied.

### D.     Applying the <u>Sitz</u> Criteria

In <u>Sitz</u>, the Court instructed that courts reviewing the lawfulness of a checkpoint consider: (1) the importance of the public concerns served by the checkpoint; (2) the effectiveness of the checkpoint in advancing the public interest; and (3) the extent of the intrusion of the checkpoint on law-abiding motorists. These criteria require a slightly more objective review of the checkpoint than the above six factors.

First, considering all the evidence and argument, the undersigned finds that the traffic safety and license checkpoint conducted on September 12, 2006, served public concerns of the utmost importance. Based on the undersigned's experience as a practicing attorney for 30 years as well as hearing and deciding traffic cases on this court's misdemeanor docket, drivers who are either unlicensed, uninsured, or impaired, and especially those that are all three, pose a real danger to community and cause untold economic and personal loss to other law abiding drivers. Checkpoints such as the one conducted on September 12, 2006, not only ferret out such traffic offenders, but serve to deter would be drunk and unlawful drivers from venturing on the streets. This court knows of no more effective means than license checkpoints to address these public concerns.

Second, the court has considered the effectiveness of this checkpoint. Clearly, in the one incident on which such evidence was presented, it is clear to this court that the checkpoint was effective in taking an unlicensed driver off the street, namely Ms. Davis.

Third, the court has considered the extent of the intrusion of the checkpoint on law-abiding motorists. In this case, the checkpoint was set up at

an intersection that already required motorists to stop. From the testimony presented, it appears that law abiding motorists would only be briefly delayed in their travels, and would likely only be required to show a valid driver's license and registration to the officer posted at the stop sign. This requirement is a limited intrusion and one that all drivers of vehicles upon the streets and highways know may be required by the circumstances of driving.

Having considered the criteria of <u>Sitz</u>, the undersigned finds that the September 12, 2006, was lawful.

### E.    Consideration of the Checkpoint Under *Edmond*

The undersigned has also considered the checkpoint and the stop of defendant in light of <u>City of Indianapolis v. Edmond</u>, <u>supra</u>, wherein the Court held, as follows:

> We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion. We suggested in <u>Prouse</u> that we would not credit the "general interest in crime control" as justification for a regime of suspicionless stops. Consistent with this suggestion, each of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety. Because the primary purpose

of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment.

Id., at 41-42 (citation omitted). From the testimony elicited at the hearing, and for the reasons discussed above, it is clear that the September 12, 2006, checkpoint was for "ensuring roadway safety." Id.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendant's Motion to Suppress Evidence (#11) be **DENIED.**

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert.

<u>denied</u>, 467 U.S. 1208 (1984).

Signed: August 12, 2007

Dennis L. Howell
United States Magistrate Judge